## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KENNETH TAYLOR, derivatively on behalf of FLAGSTAR BANCORP, INC. | Civil Action No. 14-cv-10313 |
| Plaintiff, | Hon. |
| v. | |
| JOSEPH P. CAMPANELLI, MICHAEL J. TIERNEY, PAUL D. BORJA, TODD M. MCGOWAN, DANIEL LANDERS, MATTHEW A. KERIN, WALTER N. CARTER, GREGORY ENG, JAY J. HANSEN, DAVID J. MATLIN, JAMES A. OVENDEN, MARK PATTERSON, MICHAEL J. SHONKA and DAVID J. TREADWELL, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| FLAGSTAR BANCORP, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiff Kenneth Taylor ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Flagstar Bancorp, Inc. ("Flagstar" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2011 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, Flagstar is a Michigan-based holding company for Flagstar Bank, FSB (the "Bank").  Flagstar operates banking centers across Michigan and also

operates twenty-seven home-lending centers in other states. As part of its consumer services, Flagstar was one of the leading originators of residential mortgages in the country. Active in the secondary market, the Company either sells or securitizes most of its loan portfolio, generally reserving the right to service any loan it sells.

3.      Due to the nature of the Company's business, Flagstar's operations are subject to significant legal and regulatory requirements, which include (but are not limited to) regulation, examination, and supervision by the Office of the Comptroller of the United States Department of the Treasury ("U.S. Treasury"), and examination and supervision by the Federal Deposit Insurance Corporation ("FDIC").

4.      Throughout the Relevant Period, defendants caused the Company and/or the Bank to engage in fraudulent lending practices, which caused Flagstar and/or the Bank to make false certifications that resulted in the Federal Housing Administration ("FHA") accepting ultimately ineligible loans for government insurance. When the borrowers defaulted on their loans, the Department of Housing and Urban Development ("HUD") was left with the losses. Further, defendants caused the Company to lack adequate internal and financial controls and caused the Company's financial results to be materially false and misleading at all relevant times.

5.      On February 24, 2012, defendants caused Flagstar to announce that it had entered into an agreement (the "Settlement") with the United States Department of Justice ("DOJ"). The DOJ alleged that Flagstar fraudulently approved residential home mortgage loans for government insurance. As part of the Settlement, the defendants caused the Company to admit, acknowledge, and accept responsibility for submitting false certifications to HUD that induced the FHA to accept the loans for government insurance.

6.      In connection with the Settlement, the defendants caused Flagstar to agree to

make significant revisions to its internal controls and procedures, and perhaps mostly strikingly, pay up to $133 million. This was disclosed in a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on February 28, 2012. The terms of the Settlement first required Flagstar to make a payment of $15 million within thirty days. The terms of the Settlement also required Flagstar to make an additional, approximately $118 million payment (the "Additional Payment") under certain conditions.

7.      Further, the Settlement required the Company to pay a third party to monitor Flagstar's compliance with HUD and FHA lending rules for at least one year. The Bank would also be required to implement a new training program for employees involved in originating and underwriting FHA loans. Defendants caused Flagstar to agree to terminate the senior managers who oversaw the Bank's manual underwriting process.

8.      Finally, the Settlement required the Company to restate its fiscal year 2011 earnings. The terms of the Settlement increased the Company's fourth quarter and full year 2011 net loss by ***$33.3 million***.

9.      Accordingly, as a result of defendants' breaches and other misconduct, the Company has been damaged. Further, it is clear that certain defendants received excessive compensation for the year 2011, due to the fact that the compensation was based (at least in part) on false financial results that required restatement.

10.      In light of the foregoing events, on April 16, 2012, Plaintiff issued a demand pursuant to Mich. Comp. Laws § 450.1493a (the "Demand") on the Board to commence an action against certain current and/or former directors and executive officers of the Company. A true and correct copy of the Demand is attached hereto at Exhibit A.

11.      On July 2, 2012, the Board, through Craig A. Newman ("Newman") of the law

firm of Richards Kibbe & Orbe LLP ("Richards Kibbe"), sent a letter to Plaintiff's counsel indicating that Richards Kibbe had been retained to represent a Special Committee ("SC") formed by the Board to investigate and consider what action is in the best interest of the Company. A true and correct copy of Mr. Newman's letter is attached hereto as Exhibit B.

12.     Notwithstanding the fact that it took over one and one half months for defendants to even acknowledge the Demand, yet another year and a half has passed, and the Board has provided Plaintiff with literally no substantive response to the Demand whatsoever. This, despite numerous attempts by Plaintiff's counsel to reach attorneys at Richards Kibbe regarding the status of the investigation and an expected timeframe for Plaintiff to receive a substantive response to the Demand.

13.     Clearly, the Board's complete disregard of the Demand (issued nineteen months ago) which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

14.     Thus, this shareholder derivative action should be allowed to proceed.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either

resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

17.     Plaintiff is a current shareholder of Flagstar and has continuously held Flagstar stock since April 2010.  Plaintiff is a citizen of the State of Wyoming.

18.     Nominal defendant Flagstar is a Michigan corporation, with its principal executive offices at 5151 Corporate Drive, Troy, Michigan 48098.  According to its public filings, Flagstar is a Michigan-based holding company for the Bank, operating banking centers across Michigan as well as home-lending centers in other states.

19.     Defendant Joseph P. Campanelli ("Campanelli") served as the Company's Chairman of the Board and Chief Executive Officer ("CEO") from 2009 until November 1, 2012.  Upon information and belief, defendant Campanelli is a citizen of Massachusetts.

20.     Defendant Michael J. Tierney ("Tierney") served as the Company's President from October 2012 until 2013, as CEO from November 2012 until May 2013, a director from November 2012 until 2013, and as EVP and Managing Director, Personal Financial Services since February 2011.  Upon information and belief, defendant Tierny is a citizen of Michigan.

21.     Defendant Paul D. Borja ("Borja") has served as the Company's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since 2005.  Upon information and belief, defendant Borja is a citizen of Michigan.

22.     Defendant Todd M. McGowan ("McGowan") has served as the Company's Managing Director of Regulatory Affairs since April 2013.  Previously, McGowan served as the Company's EVP and Chief Risk Officer from January 2010 until April 2013.  Upon information

- 5 -

and belief, defendant McGowan is a citizen of Michigan.

23.     Defendant Daniel Landers ("Landers") has served as the Bank's EVP and Chief Credit Officer since February 2011.  Upon information and belief, defendant Landers is a citizen of Michigan.

24.     Defendant Matthew A. Kerin ("Kerin") has served as EVP and President, Mortgage Banking Division since December 2012.  Previously, Kerin served as EVP and Managing Director, Mortgage Banking and Warehouse Lending from 2009 until 2012.  Upon information and belief, defendant Kerin is a citizen of Michigan.

25.     Defendant Walter N. Carter ("Carter") has served as a director of the Company since 2009.  Upon information and belief, defendant Carter is a citizen of Missouri.

26.     Defendant Gregory Eng ("Eng") served as a director of the Company from 2009 until March 25, 2013.  Upon information and belief, defendant Eng is a citizen of New York.

27.     Defendant Jay J. Hansen ("Hansen") has served as a director of the Company since 2005.  In addition, defendant Hansen served as Chair of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Hansen is a citizen of Michigan.

28.     Defendant David J. Matlin ("Matlin") has served as a director of the Company since 2009.  Upon information and belief, defendant Matlin is a citizen of New York.

29.     Defendant James A. Ovenden ("Ovenden") has served as a director of the Company since 2010.  In addition, defendant Ovenden served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Ovenden is a citizen of South Carolina.

30.     Defendant Mark Patterson ("Patterson") served as a director of the Company from

- 6 -

2009 until July 2012.  Upon information and belief, defendant Patterson is a citizen of New York.

31.     Defendant Michael J. Shonka ("Shonka") has served as a director of the Company since June 2011.  In addition, defendant Shonka served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Shonka is a citizen of Kansas.

32.     Defendant David J. Treadwell ("Treadwell") has served as a director of the Company since 2009.  Upon information and belief, defendant Treadwell is a citizen of Michigan.

33.     Collectively, defendants Campanelli, Tierney, Borja, McGowan, Landers, Kerin, Carter, Eng, Hansen, Matlin, Ovenden, Patterson, Shonka and Treadwell shall be referred to herein as "Defendants."

34.     Collectively, defendants Hansen, Ovenden and Shonka shall be referred to as the "Audit Committee Defendants."

### DEFENDANTS' DUTIES

35.     By reason of their positions as officers, directors, and/or fiduciaries of Flagstar and because of their ability to control the business and corporate affairs of Flagstar, Defendants owed Flagstar and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Flagstar in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Flagstar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Flagstar and its shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36.     Defendants, because of their positions of control and authority as directors and/or officers of Flagstar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Flagstar, each of the Defendants had knowledge of material non-public information regarding the Company.

37.     To discharge their duties, the officers and directors of Flagstar were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Flagstar were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

38.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

    a.   Review with the management the quality and adequacy of internal controls that could significantly affect the Company's financial statements;

    b.   Meet to review and discuss with management the Company's quarterly and annual financial statements;

    c.   Review and discuss the annual audited financial statements and other financial information with management and the independent auditor, including disclosures made in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the Company's Form 10-K, and recommend to the Board whether the annual audited financial statements should be included in the Company's Form 10-K.

    d.   Review and discuss the Company's policies with respect to risk assessment and risk management, including any guidelines and policies governing the process by which the Chief Executive Officer and other senior management assess and manage the Company's exposure to risk and any mechanisms the Company has in place to manage and assess its risk.

    e.   Review and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

    f.   Review with management and advises the board with respect to the Company's policies and procedures and procedures regarding compliance with applicable laws and regulations and with the Company's code of ethics, and obtain reports concerning the monitoring of compliance with such policies.

    g.   Review and discuss disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein which could adversely affect the Company's ability to record, process, summarize and report financial data and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls.

    39.   Pursuant to the Charter of the Compliance Committee, the members of the Compliance Committee (which included, but were not limited to defendants Hansen, Treadwell and Matlin) are required, *inter alia*, to:

    a.   Oversee the Bank's and the Holding Company's compliance with its existing Supervisory Agreement, Consent Order and any supervisory agreement or other supervisory or administrative action taken or imposed by the Office of the Comptroller of the Currency ("OCC") or any federal or state regulatory authority;

    b.   Submit written progress reports to the Board of Directors of Flagstar Bank setting forth in detail the actions taken to comply with the provisions of the Consent Order, and the results and status of those actions, within 60 days of

the effective date of the respective Consent Order and quarterly thereafter, and to instruct the Board of Directors of Flagstar Bank to forward a copy of each of the Committee's written reports with any additional comments by the Board of Directors of Flagstar Bank to the Assistant Deputy Comptroller for Mid-Size Bank Supervision of the OCC (the "Assistant Deputy Controller") and the Examiner-in-Charge (together, the "OCC Examiners") within ten days of receiving such reports;

c.  Make regular interim reports to the Boards of Directors on its activities and management's progress relative to each of the Consent Order Articles;

d.  Monitor Mortgage Banking operating Key Productivity Indicators along with Key Risk Indicators for compliance with Matter's Requiring Attention (in each "MRA" and collectively, the "MRAs") identified in Report of Examination or subsequent Supervisory Letters. In addition the Committee is to review and approve any changes to Mortgage Banking Policies [and procedures] prior to the proposed changes are placed into operation;

e.  Receive regular reports from management concerning all action called for by management or the Board of Directors of the Bank in the Consent Order, or through any other communication from the OCC, and concerning all action directed by the Board of Directors of the Bank in connection with the Consent Order. The Committee shall direct timely corrective action for any non-compliance with action called for under the Consent Order and as otherwise directed by the Board of Directors of the Bank with respect to the Consent Order;

f.  Serve generally as a liaison between the Boards and the regulatory agencies; and

g.  Provide oversight and guidance to the Bank's and the Holding Company's management with respect to such regulatory matters material to the Bank and the Holding Company, as the Committee may determine.

40.   According to the Risk Committee's Charter, every member of the Risk Committee (which included, but was not limited to defendants Treadwell and Carter) is required to:

a.  At least annually, review and approve the charters of the Asset/Liability Management Committee ("ALCO"), and that of the Risk Management Committee. The Committee shall also review and approve the Company's significant risk assessment and risk management policies. In addition, the Committee retains the ability to authorize management to develop and

       implement any additional policies relating to risk assessment and risk management.

b. Receive information from the Chief Risk Officer regarding the activities of any Risk Management Sub-Committees formed under its Charter and discuss matters related to the Company's aggregate risk profile as appropriate.

c. Review any significant issues raised by regulatory agencies relating to risk management activities and management's response to issues identified in regulatory examination reports.

d. Review the Company's disclosure of Risks in all filings with the Securities and Exchange Commission (Including the Form 10-K Annual Report).

e. Perform other activities related to this Charter as requested by the Board of Directors.

f. Review and assess the adequacy of the Committee Charter, at least annually, requesting Board approval for proposed changes, and ensuring appropriate disclosure as may be required by law or regulation.

g. Annually review the Committee's own performance.

h. Review and affirm Management's recommendations for loan approvals in accordance with the Bank's Loan and Credit Policies.

## SUBSTANTIVE ALLEGATIONS

**A.**    **Company Background**

41.    According to its public filings, Flagstar is a Michigan-based holding company for the Bank, operating banking centers across Michigan as well as home-lending centers in other states.

**B.**    **Defendants' False and Misleading Statements**

42.    On April 26, 2011, Defendants caused the Company to issue a press release entitled "Flagstar Reports First Quarter Results."  The press release set forth, in relevant part:

Flagstar Bancorp, Inc. (NYSE:FBC) (the "Company"), the holding company for Flagstar Bank FSB, today reported its first quarter results for 2011.

"During the first quarter of 2011, we significantly reduced our net loss from both the prior quarter and the first quarter of 2010, and experienced a fourth straight quarter of declining credit costs, while at the same time, strengthening our capital and liquidity ratios and further de-risking our balance sheet," commented Joseph P. Campanelli, Chairman of the Board, President and CEO.

Campanelli continued, "We've also formally launched our commercial banking initiative, adding several key experienced and proven commercial banking executives to our leadership team during the quarter. In addition, the liquidity we have generated from sales of non-performing loans, seasonal pay-downs and reduced loan originations helps position us to fund new C&I growth while preserving our strong capital ratios."

For the first quarter 2011, the net loss applicable to common stockholders totaled $(31.7) million, or $(0.06) per share (diluted) based on average shares outstanding of 553,555,000, as compared to a fourth quarter 2010 net loss of $(192.1) million, or $(0.74) per share (diluted) based on average shares outstanding of 259,946,000. For the first quarter 2010, net loss was $(81.9) million, or $(1.05) per share (diluted) based on average shares outstanding of 77,699,000.

43.     On May 9, 2011, Defendants caused the Company to file its quarterly report with the SEC on Form 10-Q.  The Form 10-Q reiterated the Company's financial results set forth in the press release.  In addition, pursuant to the Sarbanes-Oxley Act of 2002, the Form 10-Q contained signed certifications ("SOX Certifications") by defendants Campanelli and Borja, stating that the financial information contained in the Form 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.  The SOX Certification set forth:

I, [Joseph P. Campanelli/Paul D. Borja] certify that:

(1) I have reviewed this quarterly report on Form 10-Q of Flagstar Bancorp, Inc. (the "registrant");

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange

- 12 -

Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

> (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

In connection with the quarterly report of Flagstar Bancorp, Inc. (the "Company") on Form 10-Q for the quarter ended March 31, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I [Joseph P.

- 13 -

Campanelli, President and Chief Executive Officer of the Company/Paul D.
Borja, Executive Vice President and Chief Financial Officer of the
Company], certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of
the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material
respects, the financial condition and results of operations of the Company.

44.     On July 26, 2011, Defendants caused the Company to issue a press release

entitled "Flagstar Reports Second Quarter Results."  The press release reported, in relevant part:

Flagstar Bancorp, Inc. (NYSE: FBC) (the "Company"), the holding company for
Flagstar Bank, FSB (the "Bank"), today reported a second quarter 2011 net loss
applicable to common shareholders of $(74.9) million, as compared to a first
quarter 2011 net loss of $(31.7) million and a second quarter 2010 net loss of
$(97.0) million.

"Our net loss this quarter, while an improvement of 23 percent from second
quarter 2010, was principally the result of continued credit costs associated with
our legacy balance sheet. We are able to generate positive core earnings to offset
those credit costs, driven by strong mortgage banking revenues, and are
encouraged by the ongoing success we have had in implementing a number of
initiatives to de-risk and generate high-quality interest-earning assets for our
balance sheet. We continue to take aggressive steps to put legacy issues behind
us, and remain focused on balancing the solid revenue base provided by our long-
standing mortgage business with our continued efforts to execute on our
transformation strategy to a diversified super community bank," commented
Joseph P. Campanelli, Chairman of the Board, President and CEO.

Campanelli continued, "We are encouraged by the early success of our
commercial and specialty banking initiative, originating almost $100 million in
high quality commercial loans for our balance sheet during the quarter. In
addition, we continue to grow our commercial loan portfolio, and maintain an
active and robust pipeline that is consistent with our commercial growth strategy.
We also opened four new commercial banking centers during the quarter, and
continue to attract experienced and highly talented commercial bankers to our
team. At the same time, we maintained strong capital and liquidity levels, and
further de-risked our balance sheet by selling, for a minimal gain, $68.1 million in
non-performing commercial real estate assets, all of which will help fuel our
planned transition."

45.     On August 8, 2011, Defendants caused the Company to file with the SEC a

- 14 -

quarterly report on Form 10-Q.  The Form 10-Q reiterated the Company's financial results set forth in the press release.   In addition, the Form 10-Q contained SOX Certifications by defendants Campanelli and Borja, stating that the financial information contained in the Form 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.

46.     On October 25, 2011, Defendants caused the Company to issue a press release entitled "Flagstar Reports Third Quarter 2011 Net Loss of $14.2 Million."  The press release set forth, in relevant part:

> Flagstar Bancorp, Inc. (NYSE: FBC) (the "Company"), the holding company for Flagstar Bank, FSB (the "Bank"), today reported a third quarter 2011 net loss applicable to common shareholders of $(14.2) million, as compared to a second quarter 2011 net loss of $(74.9) million and a third quarter 2010 net loss of $(22.6) million.
>
> "Overall, we were pleased with the improvement in fundamentals on our core revenue drivers, even though such fundamentals continue to be offset by legacy credit costs. During the quarter, we reported our strongest earnings, before taxes and credit costs, since 2009. We experienced significant quarterly improvements in our bank net interest margin, our gain on loan sale income, and our mortgage originations and rate lock commitments. We also saw meaningful loan growth in our core portfolios, with our average held for investment loans increasing by an annualized rate of 13.6 percent from the prior quarter. We continue to execute on our commercial strategy, originating over $300 million in new core commercial and specialty loans, more than double the amount in the second quarter 2011," commented Joseph P. Campanelli, Chairman of the Board, President and CEO.
>
> Campanelli continued, "Our overall credit costs in the third quarter were relatively flat from the prior quarter, as we continue to work through challenges in our legacy balance sheet. We saw some encouraging trends in the third quarter, with 30-day delinquent and 60-day delinquent residential mortgage loans flat from the prior quarter, and the pace of increase slowing dramatically in the greater than 90 days delinquent residential first mortgage loans. Macroeconomic conditions and home prices remain challenging, however, we are confident we have the resources, including the capital, liquidity and leadership, necessary to support our business plan and continue our planned growth strategies."

47.     On November 9, 2011, Defendants caused the Company to file with the SEC a

quarterly report on Form 10-Q.  The Form 10-Q reiterated the Company's financial results set forth in the press release.  In addition, the Form 10-Q contained SOX Certifications by defendants Campanelli and Borja, stating that the financial information contained in the Form 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.

48.     On January 24, 2012, Defendants caused the Company to issue a press release entitled "Flagstar Reports Fourth Quarter and Full Year 2011 Results."  The press release set forth, in relevant part:

> Flagstar Bancorp, Inc. (NYSE: FBC) (the "Company"), the holding company for Flagstar Bank, FSB (the "Bank"), today reported *a fourth quarter 2011 net loss applicable to common stockholders of $(44.9) million, as compared to a third quarter 2011 net loss of $(14.2) million and a fourth quarter 2010 net loss of $(192.1) million. The full year 2011 net loss applicable to common stockholders was $(165.6) million, compared to a full year 2010 net loss of $(393.6) million.*
>
> *"Our results for the fourth quarter and full year 2011 reflect near-record revenues from our mortgage banking business, significant growth in net interest margin, de-risking of our balance sheet through building of reserves, and the benefits of our continuing transition to a full-service commercial bank.* While our 2011 results were negatively impacted by a challenging operating environment, we remain well capitalized with significant liquidity and look forward to delivering improved results in 2012," commented Joseph P. Campanelli, Chairman of the Board, President and CEO.
>
> Campanelli continued, "I am proud of all that we have been able to accomplish this year.  During the fourth quarter, we transitioned to a new regulatory agency, made significant enhancements and investments in our mortgage loan servicing area, and successfully completed the divestitures of our retail branches in the Indiana and Georgia markets." [Emphasis added.]

49.     Throughout the Relevant Period, Defendants caused the Company and/or the Bank to engage in fraudulent lending practices, which caused Flagstar and/or the Bank to make false certifications that resulted in the FHA accepting ultimately ineligible loans for government insurance.  When the borrowers defaulted on their loans, HUD was left with the losses.  Further,

- 16 -

Defendants caused the Company to lack adequate internal and financial controls and caused the Company's financial results to be materially false and misleading at all relevant times.

### C.   <u>The Truth Begins To Emerge</u>

50.   On February 24, 2012, Defendants issued a press release entitled "Flagstar Enters into Agreement with Department of Justice."  Among other things, the press release revealed that the Company could be liable for payments of up to $118 million.  The press release set forth, in relevant part:

> ***Flagstar Bancorp, Inc. (NYSE: FBC) (the "Company"), the holding company for Flagstar Bank, FSB (the "Bank"), today announced that the Bank has entered into an agreement (the "Agreement") with the United States Department of Justice (the "DOJ") relating to certain underwriting practices associated with loans insured by the Federal Housing Administration ("FHA") of the Department of Housing and Urban Development ("HUD").  As a result of the Agreement, the Company will be revising its fourth quarter and full year 2011 financial results (as further described below).***  However, the Company is reaffirming the 2012 guidance it provided on its fourth quarter 2011 earnings call.
>
> "Flagstar Bank is one of the leading originators and servicers of FHA insured loans, and we remain committed to continuing in that capacity," said Joseph P. Campanelli, Chairman of the Board, President and CEO.  "This agreement with the Department of Justice allows us to move forward, and to continue to focus on core operations and on serving our customers."
>
> Campanelli added, "As our recent results demonstrate, our mortgage origination, commercial and retail banking operations continue to perform well, positioning us to achieve profitability in 2012.  Importantly, the default rates on the FHA loans we have underwritten continue to perform favorably relative to the rest of the industry.  We are pleased to have resolved this matter and look forward to continuing as a committed partner with FHA and HUD.  We look forward to executing on our strategic plan to grow and diversify our business and create value for our shareholders."
>
> <u>Material Terms of Agreement with the DOJ</u>
>
> On February 24, 2012, the Bank and the DOJ entered into the Agreement pursuant to which the Bank will:
>
> - Agree to comply with all applicable HUD and FHA rules related to the continued participation in the direct endorsement lender program;

- *Make an initial payment of $15 million within 30 business days of the effective date of the Agreement;*
- *Only upon the occurrence of certain future events (as further described below), become obligated to make payments of up to approximately $118 million (the "Additional Payments")*; and
- Complete a monitoring period by an independent third party chosen by the Bank and approved by HUD.

*The Additional Payments will occur if and only if each of the following events happen:*

- *The Company generates positive income for a sustained period, such that part or all of its Deferred Tax Asset ("DTA"), which has been offset by a valuation allowance (the "DTA Valuation Allowance"), is likely to be realized, as evidenced by the reversal of the DTA Valuation Allowance in accordance with US GAAP;*
- *The Company is able to include capital derived from the reversal of the DTA Valuation Allowance in its Tier 1 capital; and*
- *The Company's obligation to repay the $266.7 million in preferred stock held by the U.S. Department of Treasury under the TARP program has been either extinguished or excluded from Tier 1 capital for purposes of calculating the Tier 1 capital ratio as described in the paragraph below.*

Upon the occurrence of each of the future events described above, and provided doing so would not violate any banking regulatory requirement or the Office of Comptroller of Currency (the "OCC") does not otherwise object, the Bank will begin making Additional Payments provided that (i) each annual payment would be equal to the lesser of $25 million or the portion of the Additional Payments that remains outstanding after deducting prior payments; and (ii) no obligation arises until the Bank's call report as filed with the OCC, including any amendments thereto, for the period ending at least six months prior to the making of such Additional Payments, reflects a minimum Tier 1 capital ratio, after excluding any un-extinguished portion of TARP, of 11% (or higher ratio if required by regulators).

<u>Revised Fourth Quarter and Full Year 2011 Financial Results</u>

*On January 24, 2012, the Company issued its earnings release announcing financial results for the fourth quarter and full year 2011. Subsequent thereto, the Company signed the Agreement and has determined that it will recognize an accrued liability, based upon the initial payment of $15 million as of December 31, 2011.* The Company also expects to recognize an accrued liability as of December 31, 2011 relating to the Additional Payments, which it believes, for accounting purposes, will be based upon the fair value method.

The Company is currently assessing the fair value of the Additional Payments based on its current expectations of the timing of the payments, applicable discount rates and other factors. ***The Company believes that it will have an increase in net loss of between $25.9 million and $34.3 million for the fourth quarter 2011, which would include both the initial payment of $15 million and the fair value of the Additional Payments ranging from $10.9 million to $19.3 million.*** The fair value of the Additional Payments will be evaluated on a quarterly basis based upon the factors set forth above, each of which may vary substantially. As a result of the expected increase in net loss based on such range, the Bank expects its Tier 1 capital ratio at December 31, 2011 to range from 8.94% to 9.00%. Based on profitable operations during January 2012 and a slightly higher balance sheet at January 31, 2012, the Bank expects its Tier 1 capital ratio at January 31, 2012 to range from 9.15% to 9.21%.

The Company expects to issue a press release in the near future announcing the financial impact of the Agreement as of December 31, 2011. [Emphasis added.]

51.     Three days later, on February 27, 2012, Defendants issued a press release entitled

"Flagstar Issues Revised 2011 Results Based on Completed Analysis."   Therein, Defendants

revealed that the Company's fourth quarter and full year 2011 loss would increase by $29.1

million.  This press release revealed, in relevant part:

Flagstar Bancorp, Inc. (NYSE: FBC) (the "Company"), the holding company for Flagstar Bank, FSB (the "Bank"), today completed its analysis of the impact to its fourth quarter and full year 2011 financial results arising from the agreement the Bank announced with the U.S. Department of Justice on February 24, 2012.  This agreement was described in the Company's earlier press release issued on February 24, 2012. ***Based on its analysis of the agreement, the Company has revised its fourth quarter and full year 2011 financial results to reflect an increase of $29.1 million, or $(0.05) per share in net loss applicable to common shareholders.***

***As a result, for the three months ended December 31, 2011, net loss applicable to common shareholders increased to $(74.0) million, or $(0.13) per diluted share, as compared to the previously reported $(44.9) million, or $(0.08) per diluted share.  For the year ended December 31, 2011, net loss applicable to common shareholders increased to $(194.7) million, or $(0.35) per diluted share, as compared to the previously reported $(165.6) million, or $(0.30) per diluted share.  The Company expects to review its fair value analysis of the settlement amount quarterly going forward, as required by accounting rules, and make further adjustments as necessary.*** At December 31, 2011 the Bank remained well-capitalized with a revised Tier 1 capital ratio of 8.98 percent, and based on profitable operations during January 2012 and a slightly higher balance

sheet at January 31, 2012, expects a January 31, 2012 Tier 1 capital ratio of 9.18 percent.

"Our revised 2011 financial results from the agreement are well within the range initially contemplated in our announcement last Friday," said Joseph P. Campanelli, Chairman of the Board, President and CEO. "We are pleased to have this matter resolved in a manner that allows us to be a leader in originating loans as we continue our partnership with FHA and HUD. We remain well-capitalized, with strong liquidity and a committed management team that is executing on a solid business model intended to move the Company to profitability in 2012." [Emphasis added.]

52.     On March 16, 2012, Defendants caused the Company to file with the SEC a Form NT 10-K, which stated that the Company's Form 10-K would be published late.

53.     On March 20, 2012, Defendants issued a press release entitled "Flagstar Announces Revision to Fair Value Analysis of DOJ Agreement." Therein, Defendants revealed that the Company's fourth quarter and full year 2011 net loss would actually increase by $33.3 million, as opposed to the increase of $29.1 million that Defendants had announced previously. This meant that the Company's full year 2011 net loss was a staggering ***$198.9 million***. This press release revealed, in relevant part:

> Flagstar Bancorp, Inc. (NYSE: FBC) (the "Company"), the holding company for Flagstar Bank, FSB (the "Bank"), today announced a revision to its previously completed fair value analysis on the additional payments (the "Additional Payments") included as part of its agreement with the U.S. Department of Justice (the "DOJ"). This agreement was described in a press release issued by the Company on February 24, 2012.
>
> On February 27, 2012, the Company issued a press release revising its 2011 results to include a $29.1 million increase in net loss, which included both the initial payment of $15 million and the fair value of the Additional Payments. Subsequently, the Company has been in discussion with the Securities and Exchange Commission (the "SEC") and has confirmed that the SEC does not object to the Company's use of fair value to measure its obligations arising from the Additional Payments. Additionally, after discussion with the SEC, the Company has revised the discount rate assumptions used in calculating the fair value of the Additional Payments. Based on its revised discount rate assumptions, ***the Company has further revised its fourth quarter and full year 2011 financial results to reflect an additional increase of $(4.2) million, or $(0.01) per share in***

- 20 -

*net loss applicable to common shareholders.* This revision is reflected in the Company's Annual Report on Form 10-K filed today with the SEC.

*As a result, for the three months ended December 31, 2011, net loss applicable to common shareholders increased to $(78.2) million, or $(0.14) per diluted share, as compared to the previously reported $(74.0) million, or $(0.13) per diluted share. For the year ended December 31, 2011, net loss applicable to common shareholders increased to $(198.9) million, or $(0.36) per diluted share, as compared to the previously reported $(194.7) million, or $(0.35) per diluted share.* At December 31, 2011 the Bank remained well-capitalized with a revised Tier 1 capital ratio of 8.95 percent. The Bank also expects a revised January 31, 2012 Tier 1 capital ratio of 9.15 percent, as compared to the previously reported ratio of 9.18 percent. [Emphasis added.]

54.     On July 13, 2012, defendants announced that defendant Patterson had "resigned" from the Board.

55.     On October 23, 2012, Defendants announced that they had caused Flagstar to enter into a consent order with the OCC.  Defendants issued a press release which stated, in pertinent part:

Michael Tierney, President of the Bank, said, "Flagstar is a 'super-community bank' that offers the resources of a full-service bank with outstanding local customer service, and the Consent Order will have no impact on our customers or our customer relationships.  We will continue to meet and exceed the needs of our customers, and all depositor accounts, NOW accounts and non-interest bearing checking accounts remain fully insured to the maximum FDIC coverage limits. We are confident that we are taking the right steps to address the matters specified in the Consent Order."

The Consent Order reflects matters identified by the OCC during supervisory examinations of the Bank conducted mainly in the fourth quarter of 2011 and the first quarter of 2012.  Regulatory supervision of the Bank transitioned from the Office of Thrift Supervision (the "OTS") to the OCC, which under the Dodd-Frank Act became the Bank's primary regulator in July 2011.  The Consent Order replaces a previous OTS enforcement action.

Under the Consent Order, the Bank will adopt or review and revise various plans, policies and procedures related to, among other things, regulatory capital, enterprise risk management and liquidity.  The Bank will submit these plans, policies and procedures to the OCC for a written determination that the OCC has no supervisory objection to them.  Upon receipt of no supervisory objection from

the OCC, the Bank will implement and ensure adherence to the plans, policies and procedures.

"The matters reflected in the Consent Order were initially brought to our attention earlier this year by the OCC in connection with its examinations of the Bank," explained Joseph P. Campanelli, Chief Executive Officer of the Bank. Mr. Campanelli added, "For much of this year, the Bank has been devoting significant attention and resources to addressing the matters identified in the Consent Order and developing or refining the relevant plans, policies and procedures. We have already made significant progress, and the Bank's Board of Directors is committed to working closely with the OCC and to achieving full compliance with the provisions of the Consent Order."

56.    Accordingly, as a result of Defendants' breaches, the Company has been damaged. Further, it is clear that certain of the Defendants have received excessive compensation for 2011, due to the fact that the compensation was based (at least in part) on false financial results that required restatement. Notably, defendant Campanelli's 2011 compensation totaled a staggering $6,450,079, and defendant Borja's 2011 compensation totaled $749,999.

## DERIVATIVE AND DEMAND ALLEGATIONS

57.    Plaintiff brings this action derivatively in the right and for the benefit of Flagstar to redress the breaches of fiduciary duty and other violations of law by Defendants.

58.    Plaintiff will adequately and fairly represent the interests of Flagstar and its shareholders in enforcing and prosecuting its rights.

59.    In light of the foregoing events, on April 16, 2012, Plaintiff issued the Demand pursuant to Mich. Comp. Laws § 450.1493a on the Board to commence an action against certain current and/or former directors and executive officers of the Company. A true and correct copy of the Demand is attached hereto at Exhibit A.

60.    On July 2, 2012, the Board, through Newman of the law firm of Richards Kibbe, sent a letter to Plaintiff's counsel indicating that Richards Kibbe had been retained to represent the SC formed by the Board to investigate and consider what action is in the best interest of the

Company.  A true and correct copy of Mr. Newman's letter is attached hereto as Exhibit B.

61.     Notwithstanding the fact that it took over one and one half months for defendants to even acknowledge the Demand, yet another year and a half has passed and the Board has provided Plaintiff with literally no substantive response to the Demand whatsoever.    This, despite numerous attempts by Plaintiff's counsel to reach attorneys at Richards Kibbe regarding the status of the investigation and an expected timeframe for Plaintiff to receive a substantive response to the Demand.

62.     Clearly, the Board's complete disregard of the Demand (issued nineteen months ago), which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

63.     Thus, this shareholder derivative action should be allowed to proceed.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

64.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65.     As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Flagstar disseminated accurate, truthful and complete information to its shareholders.

66.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Flagstar shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

67.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

68.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

69.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

70.     Defendants willfully ignored the obvious and pervasive problems with Flagstar's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

71.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

72.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.     Defendants owed and owe Flagstar fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Flagstar the highest obligation of good faith, fair dealing, loyalty and due care.

74.     Defendants, and each of them, violated and breached their fiduciary duties of

care, loyalty, reasonable inquiry, oversight, good faith and supervision.

75.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Flagstar has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

76.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

77.     Plaintiff, on behalf of Flagstar, has no adequate remedy at law.

**COUNT IV**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

78.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

79.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Flagstar.

80.     Plaintiff, as a shareholder and representative of Flagstar, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT V**
**AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL**

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Flagstar, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Flagstar to misrepresent material facts regarding its financial position and business prospects.

83.    As a direct and proximate result of Defendants' abuse of control, Flagstar has sustained significant damages.

84.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

85.    Plaintiff, on behalf of Flagstar, has no adequate remedy at law.

**COUNT VI**
**AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

86.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.    Defendants had a duty to Flagstar and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Flagstar.

88.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Flagstar in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Flagstar's affairs and in the use and preservation of Flagstar's assets.

89.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Flagstar to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Flagstar, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Flagstar.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Flagstar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to Flagstar restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: January 24, 2014              **OLIVER LAW GROUP PC**

                               /s/ Alyson Oliver
                               Alyson Oliver (P55020)
                               950 W. University Dr., Ste. 200
                               Rochester, MI 48307
                               Notifications@oliverlg.com

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER *(to be admitted)*
BRETT D. STECKER *(to be admitted)*
JEFFREY J. CIARLANTO *(to be admitted)*
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile:  (610) 408-8062

RYAN & MANISKAS, LLP
KATHARINE RYAN *(to be admitted)*
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: (484) 588-5516
Facsimile:  (484) 450-2582

Counsel for Plaintiff

## VERIFICATION

I, Kenneth Taylor, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: ___1 / 03 / 14___                          _Kenneth Taylor_
                                                              Kenneth Taylor